*Relief Requested Without a Hearing*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>**DONALD BOLSTRIDGE,**<br><br>Debtor. | **Chapter 7**<br>**Case No. 20-20008** |

### TRUSTEE'S MOTION FOR ORDER COMPELLING NESTLE WATERS NORTH AMERICA AND/OR ITS AFFILIATES TO APPEAR FOR RULE 2004 EXAMINATION AND PRODUCE DOCUMENTS IN CONNECTION THEREWITH

Anthony J. Manhart (the "Trustee"), in his capacity as the trustee of the chapter 7 estate of Donald Bolstridge (respectively, the "Estate" and the "Debtor"), by and through undersigned counsel, hereby moves (the "Motion") this Court for the entry of an order authorizing the examination of Nestle Waters North America, Inc. and/or its subsidiary Poland Spring Company (and/or another appropriate affiliate(s) as necessary) (collectively, "Nestle") pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Trustee seeks an examination of Nestle (the "Examination") to explore potential claims the Estate may hold or obtain the capacity to assert against Nestle or others in connection with or arising from the prepetition business relationship between Nestle, Superior Trucking, LLC ("Superior Trucking"), and the Debtor. In support of this Motion, the Trustee states as follows:

### JURISDICTION AND VENUE

1. The United States District Court for the District of Maine (the "District Court") has original, but not exclusive, jurisdiction over this chapter 7 case pursuant to 28 U.S.C. § 1334(a) and over this Motion pursuant to 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157(a) and Rule 83.6 of the District Court's Local Rules, the District Court has authority to refer and has referred this chapter 7 case to this Court.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court has constitutional authority to enter judgment in this proceeding.

3. Venue in this chapter 7 case is proper in this district pursuant to 28 U.S.C. § 1408, and venue in this action is proper in this district pursuant to 28 U.S.C. § 1409.

4. The relief requested in this Motion is predicated upon Bankruptcy Rule 2004 and Rule 2004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Maine (the "Local Rules").

## BACKGROUND

**A.    Pre-Petition Background and Business Relationship with Nestle**

5. Based on his preliminary investigation to date, the Trustee understands that the Debtor was the owner of Superior Trucking, and the Debtor worked as a truck driver in various industries in Maine since 2005. The Debtor and Superior Trucking began working with Nestle around the summer of 2015, by transporting water tanks from natural springs to Poland Spring's facilities or other facilities. The Debtor and Superior Trucking initially ran only one or two routes for Nestle each week. Soon, however, Nestle expanded the amount of business it did with the Debtor, and in the fall of 2015, an additional truck was purchased and a new driver was hired to meet Nestle's growing demands.

6. The Trustee further understands that, as part of the business relationship with Nestle, the Debtor and Superior Trucking were required to obtain Nestle's approval for any new trucks purchased and any new drivers hired. Nestle also required new trucks to be customized to Nestle's specifications for transporting water tanks, which, in turn, made it impracticable to use the trucks for work with other customers. Nestle also required new drivers to undergo Nestle's "new employee" training and safety training, and to wear approved apparel and helmets that met

Nestle's requirements. In short, Nestle exerted significant control and oversight over the relationship.

7. As business with Nestle expanded, the Trustee understands that Superior Trucking and the Debtor incurred significant debt to finance new trucks that were purchased to continue and grow the business with Nestle, sometimes at a cost of $150,000 or more for each new truck. The Trustee further understands that Nestle may have induced the Debtor to continue to take on this new debt with the promise (explicit or implied) that Nestle would provide more work if more trucks and drivers were made available. Nestle also may have provided assurances, either directly or indirectly, to lenders about continued work for the Debtor that induced those lenders to provide new loans for certain of the new trucks. At the same time that business was expanding, Nestle required exclusivity from Superior Trucking and the Debtor, making service demands, often with little notice, that forced them to turn down other work to ensure availability to meet Nestle's demands. All of these factors made the Debtor and Superior Trucking highly reliant on Nestle for continued business and allowed Nestle to exert significant control over nearly every aspect of the Debtor's business and its employees.

8. By the fall of 2018, Superior Trucking had significantly grown the number of trucks in its fleet, and it was running routes nearly 24/7 for Nestle, with great success. Later in the fall of 2018, however, even as some business slowed, a representative from Nestle allegedly informed the Debtor that Nestle would provide sufficient work to keep the trucks in regular use. This statement led the Debtor not to sell any trucks to address Superior Trucking's mounting debts or to otherwise attempt to restructure the business. At its peak, the Debtor and Superior Trucking may have been generating between $1.5 million and $2 million in annual revenue from the Nestle relationship.

B.  **Nestle Terminates the Relationship**

9.  By May 2019, Superior Trucking and the Debtor were transporting 80 to 100 loads of water for Nestle per week, which was lower than in prior years but still adequate to generate enough revenue to sustain the business, including its significant debt obligations from the new trucks that were acquired at Nestle's urging.  Around this time, Nestle also changed the payment processing system that it used to pay invoices, which caused delays in payments after invoices were submitted.  The strain caused by Nestle's failure to make timely payments reached a breaking point in the summer of 2019.  Of note, the Debtor allegedly maintained a fuel credit account in order to refuel its fleet of trucks and keep its business operational.  Due to Nestle's slow paying of invoices, Superior Trucking was unable to make timely payments on its fuel account on one occasion in early July 2019, maxing out the line of credit.  Abruptly, and without notice, a Nestle representative called the Debtor and informed him that Nestle would no longer work with Superior Trucking.  The Debtor received no other notice and had no prior performance issues with Nestle.  The very next day, Nestle replaced the Debtor with a new transportation company, a much larger company that quickly took over the same exact routes.  It is unknown if Nestle was negotiating with the replacement company before terminating with the Debtor.  Nestle then informed that Debtor it would no longer do any further business with the Debtor or Superior Trucking.

10.  After Nestle terminated the relationship, the Debtor made efforts to keep Superior Trucking's trucks operating, but he was unable to find sufficient new business after working exclusively with Nestle for several years.  In addition, Superior Trucking had to incur new costs that it could not afford to retrofit its trucks for new work, as the customizations required by Nestle made the trucks unsuitable for most other jobs.  Eventually, much of Superior Trucking's

fleet was repossessed by lenders, and Superior Trucking shut down its operations in late 2019 or early 2020. The Debtor was forced to file his Chapter 7 petition on January 8, 2020.

11. The Trustee believes that the Estate may have claims against Nestle or others arising from the prepetition relationship between Nestle, Superior Trucking, and the Debtor.[1] Recovery on any of these claims would provide a financial benefit to the Estate and its creditors, as the proceeds would be used to fund payments to general unsecured creditors (subject to payment of higher priority claims as provided by the Bankruptcy Code and this Court's orders, including the contingency fee recovery and administrative expenses).

12. The Trustee further notes that the above summary of facts is based only on a preliminary investigation by the Trustee and his counsel, including information learned at the 341 meeting. The Trustee, of course, has yet to commence a Rule 2004 examination, nor has he obtained any other discovery that might become available at a later date if causes of action are pursued. The Trustee believes that, based on information obtained to date, viable claims may exist to the benefit of the Estate, and further investigation is warranted.[2]

**C.    RELIEF REQUESTED**

13. By this Motion, the Trustee requests that this Court enter an order compelling Nestle to appear, through a qualified representative, for the Examination regarding the topics identified in **Appendix A** attached hereto, at a date to be mutually agreed to between the Trustee and Nestle, or on such other date or place as this Court may order as necessary. The Trustee also seeks an order compelling the production of the documents in Nestle's possession, custody, or

---

[1] Given the preliminary nature of the review and in the interest of preserving the confidentiality of his litigation strategy, the Trustee has not identified those potential claims herein. The Trustee anticipates having a clearer understanding of those claims after the Examination, as Rule 2004 intends.

[2] The Trustee also notes that undersigned counsel is retained on a contingency fee basis only. Accordingly, the Rule 2004 investigation will not give rise to any additional administrative expense claims against the Estate, which might be the case if counsel was retained on an hourly basis.

5

control that are identified in **Appendix A**, such that the Trustee may examine those documents and use them at the Examination.

### BASES FOR RELIEF

14. Rule 2004 provides that, on motion of any party in interest, the Court may order the examination of any entity with respect to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate…." Fed R. Bankr. P. 2004(a) and (b). "The attendance of an entity for examination and for the production of documents, whether the examination is to be conducted within or without the district in which the case is pending, may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial." Fed. R. Bankr. P. 2004(c).

15. The primary purpose of a Rule 2004 examination is to permit the estate's fiduciaries and stakeholders to unearth assets. As an early decision noted in an often repeated characterization, the "purpose of a Rule 2004 examination is to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved." In re Coffee Cupboard, Inc., 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (citing Cameron v. United States, 231 U.S. 710, 717 (1914) (discussing a predecessor to Rule 2004)). "[T]he purpose of a Rule 2004 exam is 'to assist a trustee in a bankruptcy proceeding to learn quickly about the debtor entity so that he or she may maximize the realization of the debtor's estate and discover the existence and location of assets of the estate.'" In re Metiom, Inc., 318 B.R. 263, 270 n.6 (S.D.N.Y. 2004) (citing, inter alia, In re Dinubilo, 177 B.R. 932, 940 (E.D. Cal. 1993)). In addition, Rule 2004 enables a party in interest to:

> obtain information about the debtor's financial condition, matters that may affect the administration of the debtor's estate, right to a discharge, or operation of a business and the desirability of its continuance, sources of, and consideration for,

>money or property to consummate a plan, and other matters relevant to the case or formulation of a plan.

In re Daisytek, Inc., 323 B.R. 180, 187 (N.D. Tex. 2005).  Thus, Rule 2004 is **extremely broad** in scope; in what is now a well-worn description, a Rule 2004 examination has been likened to a lawful "fishing expedition."  In re Bennett Funding Group, Inc., 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996); In re Youk-See, 450 B.R. 312, 319 (Bankr. D. Mass. 2011) ("[T]he scope of a Rule 2004 examination is unfettered and broad…. The examination ... is of necessity to a considerable extent a fishing expedition.") (quotation and citation omitted).

16. The examination of (and seeking production of documents from) "any entity" is explicitly permitted under Rule 2004 because third parties are likely to have most, if not all, of the relevant knowledge and facts.  See In re Valley Forge Plaza Assoc., 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990).  "Discovery under Rule 2004 extends beyond the debtor to persons associated with him as well as to those persons who may have had business dealings with the debtor."  In re CIS Corp., 123 B.R. 488, 490 (S.D.N.Y. 1991).  Accordingly, among other purposes, Rule 2004 is designed for use as a pre-litigation discovery device, useful for both discovering potential estate causes of action and supporting facts in the first instance, as well as to determine the odds of a successful prosecution of the claim.  As the court stated in Bennett Funding Group: "[Rule 2004] is properly used as a pre-litigation device to determine whether there are grounds to bring an action…," and the rule is a "broad discovery tool."  Bennett Funding Group., 203 B.R. at 28; see also In re Whitley, No. 10-10426C-7G, 2011 WL 6202895, at *2 (Bankr. M.D.N.C. Dec. 13, 2011) ("A trustee may use Rule 2004 as a pre-discovery device to unearth claims and causes of action for the estate and reveal the breadth and nature of the estate."); In re Washington Mutual, Inc., 408 B.R. 45, 53 (Bankr. D. Del. 2009) ("[o]ne of the primary purposes of a Rule 2004 examination is as a pre-litigation device").  Thus, as the court

in Mirant Corporation emphasized, the Rule's utility is in ensuring that "no viable cause of action is lost," and that "all possible claims … have been identified." Mirant Corp., 326 B.R. at 357.

17. Here, sufficient cause exists under the circumstances for this Court to authorize the Trustee to conduct the Examination of Nestle as proposed herein, including the production of documents set forth in **Appendix A**. The Trustee believes that, based on an initial investigation, Nestle's conduct may have caused significant monetary harm to the Debtor and Superior Trucking, and that such conduct may give rise to causes of action if further investigation as permitted. Through the Examination, for instance, the Trustee seeks to determine the scope of Nestle's control over the Debtor's business and whether Nestle induced the Debtor and Superior Trucking to take on unsustainable levels of debt, while only later creating a new rationale to terminate business and replace it with another company. The production of documents, moreover, is critical to the exploration of these and other issues, as documents are necessary to evidence, clarify, prove, or explain such issues to the ultimate benefit of the estate. Accordingly, the factual predicate for seeking the Motion and the benefit to the Estate from conducting the Examination are more than sufficient to overcome the low bar set by Rule 2004.

### Local Rule 2004-1(a) Compliance

18. If this Motion is granted, the Trustee will work with the parties to schedule a mutually convenient time for the Examination. Accordingly, the Trustee does not believe that Local Rule 2004-1 applies because no fixed date is sought through this Motion. The Trustee reserves the right to seek an order compelling a specific Examination date it one cannot be agreed to by consent with Nestle or any other party subject to the relief sought in this Motion.

**CONCLUSION**

WHEREFORE, the Trustee requests that this Court enter an order pursuant to Bankruptcy Rule 2004 authorizing the Trustee to conduct the Rule 2004 examinations at mutually agreeable dates or such other dates as may be ordered by this Court. In addition, the Trustee requests authority to seek to compel production of the documents from Nestle requested in **Appendix A** pursuant to Bankruptcy Rule 2004(c).

Dated: February 4, 2021

**ANTHONY J. MANHART, IN HIS CAPACITY AS THE TRUSTEE OF THE CHAPTER 7 ESTATE OF DONALD BOLSTRIDGE**

By his counsel:

*/s/ Adam R. Prescott*
Adam R. Prescott, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street, P.O. Box 9729
Portland, ME 04104-5029
Tel: (207) 774-1200
Fax: (207) 774-1127

# APPENDIX A

## Definitions

In construing these Document Requests, the following definitions shall apply:

A. "Debtor" shall mean Donald Bolstridge.

B. "Document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure, made applicable by the Federal Rules of Bankruptcy Procedure, including, but not limited to, all originals, non-identical copies, amendments, restatements, and drafts of any written, printed, handwritten, recorded, or graphic matter of any kind, however produced or reproduced, and regardless of where located, including, but not limited to, any work paper, correspondence, memorandum, note, research, checklist, opinion, minutes, electronic mail, report, chart, graph, summary, index, diary, desk or pocket calendar, notebook, any magnetic or other recording tape, computer data (including information or programs stored in a computer, whether or not ever printed out or displayed), photograph, microfiche, microfilm, videotape, record, or motion picture, and electronic, mechanical, or electrical record or representation of any kind, including but not limited to tape, cassette, disc, magnetic card, or recording. "Document" shall include metadata and/or other identifying information for those documents stored electronically, including electronic mail. "Document" shall also include the file folders in which said documents are maintained and any table of contents or index thereto; and copies of documents of which the originals have been destroyed pursuant to a document destruction policy or otherwise.

C. "Nestle" shall mean Nestle Waters North America, Inc., including any predecessors, subsidiaries, affiliates, divisions, directors, officers, employees, agents and

1

representatives, and all those who act or have acted on any or all such entities' behalf, including but not limited to Poland Spring.

    D.    "Petition Date" shall mean January 8, 2020.

    E.    "Poland Spring" shall mean Poland Spring Company, including any predecessors, subsidiaries, affiliates, divisions, directors, officers, employees, agents and representatives, and all those who act or have acted on any or all such entities' behalf, including but not limited to Nestle.

    F.    "Relate to" or "relating to" or any variation thereof shall mean in any way directly or indirectly, in whole or in part, relating to, regarding, constituting, concerning, about, pertaining to, reflecting, considering, underlying, modifying, amending, confirming, mentioning, endorsing, evidencing, summarizing, memorializing, describing, discussing, analyzing, evaluating, representing, supporting, qualifying, terminating, revoking, canceling, or negating the matter described in the Document Request.

    G.    "Superior Trucking" shall mean Superior Trucking, LLC, including any predecessors, subsidiaries, affiliates, divisions, directors, officers, employees, agents and representatives, and all those who act or have acted on any or all such entities' behalf.

## Instructions

In responding to and interpreting these Document Requests, the following instructions shall apply:

    A.    If any Document Request, read literally, requires the production of a part or portion of a document, production of the entire document is requested.

    B.    Each Document Request contemplates the production of a document (along with all drafts thereof) in its entirety, without abbreviation or expurgation.

2

    C.     With respect to electronically stored information ("ESI"):

         a.     All electronic mail and spreadsheets responsive to these Document Requests that are maintained in the usual course of business in electronic format shall be produced in their native format along with the software necessary to interpret such files if such software is not readily available.

         b.     All other documents responsive to these Document Requests that are maintained in the usual course of business in electronic format shall be produced as searchable single-page TIFF Group IV 300 dpi images and single-page text files (the filename of the TIFF and text files should be the Bates/PageID) with a Summation DII load file which establishes appropriate document breaks and maintains parent/child relationships. A Summation DII load file is a text file that is used to load images and text into Summation establishing appropriate document breaks.

         c.     All documents responsive to these Document Requests shall be produced with the metadata normally contained within such documents, and the necessary Summation load files. If such metadata is not available, each document shall be accompanied by a listing of all file properties concerning such document, including, but not limited to, all information concerning the date(s) the document was last accessed, created, modified or distributed, and the author(s) and recipient(s) of the document.

         d.     Under no circumstances should ESI be converted from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome to use ESI. ESI should not be produced in a form that removes or significantly degrades the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means. Databases or underlying data should not be produced without first discussing production format issues with the Debtor. If you decline to search or produce ESI on the ground that such ESI is not reasonably accessible because of undue burden or cost, identify such information by category or source and provide detailed information regarding the burden of cost you claim is associated with the search or production of such ESI.

    D.     If any specific Document Request cannot be complied with in full, it shall be complied with to the extent possible, and an explanation shall be given why full compliance is not possible.

    E.     If you contend that any document responsive to a Document Request is privileged from disclosure or production, identify each document as to which privilege is claimed as

3

follows:

      i.    Date of the document;

      ii.    Author(s) of the document;

      iii.    Recipient(s) of the document, including those receiving copies via cc;

      iv.    Type of document;

      v.    Subject matter of the document; and

      vi.    The nature of the privilege claimed.

F.    As to any document which no longer exists but which you are aware existed at one time, please identify the document with as much particularity as possible, including:

      i.    The author(s), editor(s), reviewer(s) and addressee(s);

      ii.    The addressee(s) of any indicated or blind copies;

      iii.    The date, subject matter and number of pages;

      iv.    A description of any attachment(s) or appendice(s) to the document;

      v.    All persons to whom the document was distributed, shown or explained;

      vi.    The date of destruction or discard, manner of destruction or discard and reason for destruction or discard of the document; and

      vii.    The person(s) authorizing or carrying out such destruction or discard.

As to any data which no longer exists but which you are aware existed at one time, please identify the data with as much particularity as possible, including:

      i.    The author(s), editor(s) and reviewer(s);

      ii.    The recipient(s) and all other persons given access to the data by email or by other electronic form;

      iii.    The system components, machines or other locations upon which such recipients or other persons accessed the data;

      iv.    Any email servers used to send or receive the data;

   v. The creation date and subject matter;

   vi. The date of destruction or discard, manner of destruction or discard and reason for destruction or discard of the data; and

   vii. The person(s) authorizing and carrying out such destruction or discard.

 G. If a portion of an otherwise responsive document or data set contains information subject to a claim of privilege, those portions of the document subject to the claim of privilege shall be deleted or redacted from the document and the rest of the document shall be produced along with a privilege log entry.

 H. These Document Requests shall be deemed continuing. Nestle shall promptly provide additional responsive documents/data it may locate after it provides a formal response.

 I. Please provide a written response to these Document Requests in addition to providing responsive documents. Please set forth the particular Document Request in full before each response.

 J. Each paragraph or subparagraph of this Document Request should be construed independently and without reference to any other paragraph or subparagraph for the purpose of litigation.

 K. "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the Document Request inclusive rather than exclusive.

 L. "Any" includes "all" and "all" includes "any."

 M. The single includes the plural, and vice versa.

 N. All words used in the present tense shall be read to include the past tense and vice versa.

All responses shall be due within thirty (30) days of serve of these Requests.

5

**Document Requests**

1. All Documents and Communications that refer or relate to Superior Trucking or the Debtor.

2. Documents and Communications sufficient to show all payments made from Nestle to Superior Trucking or the Debtor.

3. All bills of lading or similar Documents that evidence, refer to, or relate to work orders or routes serviced by Superior Trucking or the Debtor.

4. All invoices or similar Documents to or from Superior Trucking or the Debtor.

5. All calendars, invitations, or similar Documents that evidence, refer to, or relate to meetings, calls, or conversations (whether telephonic, in person, or otherwise), between Nestle and Superior Trucking, its employees, or the Debtor.

6. All notes or similar Documents regarding or summarizing any meetings, calls, or conversations regarding Superior Trucking or the Debtor, including calls or conversations between Superior Trucking, the Debtor, and Nestle, whether internal to Nestle or external.

7. All loan applications, promissory notes, financial statement, guaranties, or similar Documents relating to Superior Trucking or the Debtor.

8. All Documents and Communications, whether internal to Nestle or external, that evidence, refer to, or related to any policy, rules, or regulations regarding the retention of trucking companies, including, but not limited to, retention standards, safety standards, truck or vehicle specifications, exclusivity requirements, capacity expectations, or employee standards.

9. All written agreements or similar Documents between Nestle and Superior Trucking or the Debtor.

10. Documents and Communications sufficient to show all trucking companies or similar service providers with which Nestle did business in Maine from 2015 to 2019.

11. Board materials or other presentations or similar Documents that refer or relate to trucking companies or similar service providers in Maine.

12. All Documents and Communications, whether internal to Nestle or external, relating to Nestle's decision and analysis to cease doing business with Superior Trucking or the Debtor.

13. All Documents and Communications that evidence, refer to, or relate to Nestle's decision and analysis regarding whether Nestle intended to continue doing business with Superior Trucking or the Debtor.

14. All Documents and Communications, whether internal to Nestle or external, regarding Superior Trucking's and the Debtor's performance during the duration of the business relationship with Nestle, including, but not limited to, compliance with Nestle's requirements or Nestle's satisfaction with the services received.

15. All Documents and Communications, whether internal to Nestle or external, regarding the financial effect on Superior Trucking or the Debtor from Nestle ceasing to do business with those parties.

16. All Documents and Communications, whether internal to Nestle or external, regarding Nestle's decision to engage a new trucking company or similar service provider to cover routes previously covered by Superior Trucking around July 2019.

17. All Documents and Communications, whether internal to Nestle or external, regarding any consideration of or plan to transition to a different transportation model or consolidate existing transportation routes for transporting water in Maine.

**Rule 2004 Examination Topics**

1. Any and all Documents or Communications produced by Nestle in response to the Document Requests.

2. Nestle's business relationship with Superior Trucking and the Debtor.

3. Nestle's decision to stop doing business with Superior Trucking and the Debtor.

4. Nestle's consideration, analysis, forecasting, projections, or strategy regarding the relationship with Superior Trucking and the Debtor.

5. Superior Trucking's and the Debtor's performance during the relationship with Nestle.

6. Nestle's decision to engage with a trucking company or similar service provider to cover service routes previously covered by Superior Trucking and the Debtor.

7. The financial effect on Superior Trucking and the Debtor as a result of Nestle ceasing to do business with those parties.

8. Nestle's knowledge of Superior Trucking's and the Debtor's debt and liabilities, including, but not limited to, debt incurred to finance or acquire trucks for use on behalf of Nestle.

9. Nestle's general policies for hiring trucking companies in Maine, and Nestle's policies regarding the requirements and expectations for those trucking companies, including as to truck specifications, employee hiring and training, safety practices, and identification and apparel.